AO 91 (Rev. 11/11)   Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
District of Oregon

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| | ) | Case No.   6:20-mj-00260-MK |
| Robin James McPherson | ) | |
| | ) | |
| | ) | |
| | ) | |

*Defendant(s)*

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ March 2015 to present _____ in the county of _____ Lane _____ in the
_____ District of _____ Oregon _____ , the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. §§ 1343, 1956 and 1957 | Wire Fraud and Money Laundering |

This criminal complaint is based on these facts:

The attached affidavit of Miguel A. Perez, which is incoporated herein

☑ Continued on the attached sheet.

_____ /s/ Miguel Perez, Per Rule 4.1 _____
*Complainant's signature*

_____ Miguel A. Perez, Special Agent FBI _____
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____ October 22, 2020 _____

_____ *Judge's signature* _____

City and state: _____ Eugene, Oregon _____     _____ Mustafa T. Kasubhai, U.S. Magistrate Judge _____
*Printed name and title*

DISTRICT OF OREGON, ss:          AFFIDAVIT OF MIGUEL A. PEREZ

**Affidavit in Support of a Criminal Complaint and Arrest Warrant**

I, Miguel A. Perez, being duly sworn, do hereby depose and state as follows:

**<u>Introduction and Agent Background</u>**

1.      I am a Special Agent (SA) with the Federal Bureau of Investigation (FBI) and

have been since January 2015.  I am currently assigned to the Portland Division at the Eugene,

Oregon Resident Agency.  During my training in the FBI Academy in Quantico, Virginia and

since I began working as a SA, I have received training in a variety of investigative and legal

matters, including the topic of a probable cause arrest by criminal complaint. My responsibilities

include the investigation of fraud and other federal criminal offenses.

2.      I submit this affidavit in support of a criminal complaint and arrest warrant for

**Robin James McPherson** (hereinafter "**McPherson**"), for Title 18, United States Code,

Sections 1343, 1956 and 1957, Wire Fraud and Money Laundering.  As set forth below, there is

probable cause to believe, and I do believe, that **McPherson** committed Title 18, United States

Code, Sections 1343, 1956 and 1957, Wire Fraud and Money Laundering.

3.      The facts set forth in this affidavit are based on the following: my own personal

knowledge; knowledge obtained from other individuals during my participation in this

investigation, including other law enforcement officers; my review of records related to this

investigation; communications with others who have knowledge of the events and circumstances

described herein; and information gained through my training and experience.  Because this

affidavit is submitted for the limited purpose of establishing probable cause in support of this

criminal complaint and arrest warrant, it does not set forth each and every fact that I or others have learned during the course of this investigation.

## Applicable Law

4.    ***Wire Fraud:*** Title 18, United States Code, Section 1343 provides, in part, that whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

5.    ***Money Laundering:*** Title 18, United States Code, Section 1956 provides, in part, that whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity with the intent to promote the unlawful activity knowing that the transaction is designed to conceal the nature of the proceeds shall be sentenced to a fine of not more than $500,000 or imprisonment for not more than twenty years, or both. Title 18, United States Code, Section 1957 provides, in part, that whoever knowingly engages in a monetary transaction in criminally derived property of a value greater than $10,000 derived from specific unlawful activity shall be punished with a fine, imprisonment, or both.

/ / /

/ / /

**Statement of Probable Cause**

6.       On August 2, 2019, the FBI initiated an investigation into Robin James

**McPherson**, AKA Raymond James & Raymond Cruz (hereinafter "McPherson"), DBA Carara

Parque Costa Rica Development Group (hereinafter "Carara"), Carara Parque Resort

Corporation CPRC SRL, and MEDUSA ABC Limitada.  Several individuals reported being the

victims of a real estate scam that was operated out of Springfield, Oregon, and the country of

Costa Rica.  The victims believed they were investing into a partial ownership of a villa that

would be part of a larger development in Costa Rica.

**7.**       **McPherson** used a variety of marketing techniques to find potential victims,

including cold calls, a website promoting Carara, and Facebook advertisements.  After victims

showed interest in investing in Carara, **McPherson**, from Costa Rica, would conduct sales calls

and explain the project to the potential investors.  McPherson used email to further sell the

project and also to send copies of the contract.  Most of the contracts described the timeline for

the construction and the completion of the investor's villa.  In general, the contracts stated the

groundbreaking on the project was scheduled for the following month and the villa would be

completed six months later.

8.       **McPherson** has continued to provide excuses to investors why no villas have

been built, while also continuing to solicit new investors with the assurance that their villa is

expected to be built within approximately six months, and that when the investor is not using the

villa, it will generate rental revenue for the investor.  **McPherson** did not disclose to investors

that previous investor contracts have not been honored and that no villas had been built.

/ / /

9.      **McPherson** directed the investors to wire the funds for the investment to a bank account in Oregon.  The funds were then wired from the Oregon bank account to Costa Rica. Between December 2015 and August 2019, approximately $1.2 was received in the Oregon bank account.  As of October 2020, no villas have been completed and the investors have not received their money back.  **McPherson** used the investors' funds to pay for other expenses, including to pay the mortgage of the house that **McPherson** lives in.

### Robin James McPherson

10.      In late February 2020, I discovered that **Robin James McPherson** was the true identity of the person purported to be "Raymond James".  **McPherson** told the victims that his name was "Raymond James" and that he was a Canadian citizen.  Another witness reported that **McPherson** had previously used the alias "Raymond Cruz".  **McPherson** also provided a copy of a Canadian passport and drivers's license with the name Raymond James to at least one of the victims.  A search was conducted of Canadian law enforcement databases for official records of Raymond James.  Canadian officials were unable to retrieve a passport with the name Raymond James and it was discovered that the copy of the passport that **McPherson** provided was not genuine.

11.      In early February 2020, a search in the Costa Rica National Registry records for Raymond James was also conducted at my request.  The name Raymond James could not be located in the records and the true identity of  "Raymond James" could not be concluded through the records checks.

12.      After I requested the Costa Rican records checks, an FBI Special Agent from the San Diego Division who is attempting to locate **McPherson** requested interviews of his

daughters who are living in Costa Rica for information on his potential whereabouts.
**McPherson** has been a fugitive since 2001.  In December 2000, **McPherson** was convicted at trial in the U.S. District Court in the Southern District of California of conspiracy to defraud the United States and two counts of tax evasion.  After being convicted, he remained at liberty on bail pending his sentencing.  **McPherson** fled the jurisdiction before a sentencing hearing in March 2001.  In preparation for the interview of the daughters, it was discovered in notes maintained at the U.S. Embassey in Costa Rica, that a tip had been received in 2004 or 2005 that **McPherson** may have utilized the name "Raymond James Cruz".

13.    I, along with other law enforcement officers, reviewed the photo of **McPherson's** California drivers' license from the year 2000 and compared it to recent photos of the person purported to be "Raymond James".  I believe that it is the same person.  I also found other evidence to show **McPherson** to be James.  In an email sent by **McPherson**, acting as James, using the email address, info@cararacostarica.com, **McPherson** shared a photo of his wedding day in 1983 and noted his wife's name was "Nidia".  **McPherson** was known to have been married to a woman with the first name of "Nidia".  I compared the photo of the woman in the wedding picture to a photo maintained in official Costa Rican records of the person believed to be **McPherson's** wife  and I believed they were the same person.  I also discovered through a victim statement that **McPherson**, using the name Raymond James, had a daughter with the first name "Dominique" that worked for **McPherson** at Carara.  I discovered **McPherson** also had a daughter named  "Dominique."

/ / /

/ / /

**Adult Victim 1**

14.     Bank records showed that Adult Victim 1 (hereinafter "AV1") invested approximately $23,770 by making two wire transfers, one on March 24, 2016, and the other on July 14, 2016, to the U.S. Bank account in Oregon, account number ending in 1837.  AV1 believed he received a cold call from someone with the Carara project because he was a real estate agent in Canada.  The caller was trying to promote the project in Canada.   AV1 traveled to Costa Rica with his wife and met with **McPherson**[1] to discuss the project.  **McPherson** showed them the whole mountain area and all the 750 acres that were planned for the development.  AV1 stayed two nights at **McPherson's** house while **McPherson** slept outside in a tent.  **McPherson** gave him a very good impression of everything.  When I interviewed AV1, he stated he was promised a 30% to 50% return on investment from **McPherson** and that was the main reason he decided to invest.  In total, AV1 and his family, including his adult children, invested approximately $48,276 into Carara.

15.     I reviewed an email from **McPherson**, using the email address info@cararacostarica.com, to AV1 that was sent on March 22, 2016.  The email was in response to some questions that AV1 had about his potential investment.  AV1 asked how much time until he would see a 50% to 75% gain.  **McPherson** responded that his best guess would be approximately 30 days and they will be 100% funded but it could be sooner.  AV1 asked when the six suites would be completed, and **McPherson** said he expected the first one to be completed in 60 days and the rest would be a "clone" of the first one and all six would be

---

[1] Robin James McPherson is referenced as "McPherson" in this affidavit for consistency purposes. McPherson used the alias Raymond James when interacting with investors/victims in person, on the phone, and by email.

completed by October 2016.  The six would be ready to rent out during the high season and

**McPherson** wanted all to be at 100% occupancy during the holidays.  AV1 asked when are they

were actually going to see income coming from their investment.  **McPherson** replied that later

in the year, the fourth quarter of 2016 or first quarter of 2017.  AV1 also asked what happens if

he wanted to get his principal invesment back.  **McPherson** replied that they would buy it back

from AV1, with it up and running, and they would be happy to have that percentage back and

that quarterly income on their side.

16.    After failing to build the villas or provide any return, AV1 has asked for his

money back.  On April 15, 2020, AV1 sent **McPherson** a message via Facebook stating, "…

What happened to past 6 plus years. I told you, just send our 50K back and we will be out of this

misery that you have put us into and we dont (sic) want to hear anything more about you or

Costa Rica."  **McPherson** responded, "its (sic) been a bit more that 3.5 years, not 6, but I

understand your point."  **McPherson** indicated to AV1 that he was working on refunding AV1's

money, but **McPherson** has not provided a refund.

### Adult Victim 2

17.    In October 27, 2016, Adult Victim 2 (hereinafter "AV2") invested $15,000 for

two shares in the Carara project by wiring the funds for the investment to the U.S. Bank account

in Oregon, account number ending in 1837.  AV2, a resident of Houston, Texas, believes he

found the Carara project on Facebook.  In October 2016, AV2 and his wife traveled to Costa

Rica to view the Carara project.  AV2 communicated with **McPherson** by email and then face to

face when he visited the property.  AV2 understood the project was going to be a large resort

with 20 units.  The units were to be rented out and the rental income would be paid to the

investors/owners.  The investor annual returns were estimated to be substantial, up to 50%.  The timing of the completion of the project contributed to AV2 and his wife investing because they believed they would be getting money within a year of the investment.  AV2 believed he should have recouped a lot of his investment by now.  AV2 has never received a return on his investment.

18.    A review of AV2's contract for the investment in Carara showed that it was dated October 21, 2016.  AV2 received the contract from **McPherson** by email using address info@cararacostarica.com.  The contract stated that AV2 was investing into the initial six ocean view luxury resort villas for $15,000 and the investor was entitled to receive two shares, 2%, of the total resort assets and income going to the investor pool.  The contract further read that the initial six villas would be part of a larger "5 Star Ocean View Luxury EcoVillas" where as many as 25 villas will be part of the resort.  The contract also stated the 50% gross revenue that is set aside for the founding investors that will be divided by a percentage of ownership of shares.

**Adult Victim 3**

19.    In 2017, Adult Victim 3 (hereinafter "AV3"), a resident of Connecticut, stated he found an advertisement for Carara on Facebook.  AV3 responded to the advertisement and was soon contacted by **McPherson**.  I reviewed emails between AV3 and **McPherson**.  In April 2017, **McPherson** sent AV3 an email telling him about investing in a house using the email address info@cararacostarica.com.  In the email, **McPherson** tells AV3 he should expect 25% to 40% annual income from rentals alone.  **McPherson** also wrote that, in addition, the asset would appreciate from $20,000 to between $30,000 to $35,000 right away.  **McPherson** also included a hyperlink to a blank version of the purchase agreement.

20.      In May 2017, AV3 invested $20,000 for a 10% ownership in a villa, wiring the

funds for the investment to the U.S. Bank account in Oregon, account number ending in 1837.

AV3 was most convinced to buy the villa because of the return on investment (ROI) **McPherson**

told him he could receive.  The contract showed potential figures of 26% to 50% ROI.  The

contract stated AV3 was purchasing one share for $20,000 for a 10% ownership.  The villa was

described in the contract as an ocean view 2 story, 2 bedroom, 2 bath 1,500 sq. foot residence.

The contract stated that groundbreaking was scheduled for July 15, 2017, and it is expected to be

finished and in the rental pool by the end of November, in time for the high season.

21.      AV3 has not received money from his investment and has talked to **McPherson**

several times about it.  In October 2017, **McPherson** told AV3 that by April 2018 the house

would be in the rental pool.  In April 2018, **McPherson** said because of weather delays the house

was not completed and it would not be until December 2018.  As of February 2020, AV3 has not

received any money from **McPherson** and the villa has not been built.

22.      In February 2020, **McPherson** sent an email to a group of investors including

AV3 using the email address info@cararacostarica.com.  **McPherson** stated that they are

restarting construction.  He stated that the weather has been very strange and that it has been the

longest rainy season in 20 years.  **McPherson** stated that with the funding that has come in and

other funding expected in February and March they should have continuous, nonstop

construction until "Villa 1" is finished around June or July of 2020.

### Adult Victim 4

23.      On June 14, 2017, Adult Victim 4 (hereinafter "AV4") invested approximately

$40,000 for two shares, at $20,000 per share, for one villa in the Carara project, by wiring the

funds for the investment to the U.S. Bank account in Oregon, account number ending in 1837. AV4, a resident of Kelowna, British Columbia, Canada, received the contract by email from **McPherson**, email address info@cararacostarica.com.  The villa was described as a 2 story, 2 bedroom, 2 bath 1,500 square foot residence.  The contract stated that the groundbreaking of the unit will be scheduled between the 15th and 30th of July, 2017 and it will be completed by the end of November.  The contract was signed by AV4.  The wiring instructions in the contract showed the information for the bank account in Oregon.

24.     In September 2017, AV4 traveled to Carara in Costa Rica to see the project.  In an email from September 2017, AV4 thanked **McPherson** for his time and hospitality.  At the end of the email AV4 stated see you again when more is there.  In an email dated February 4, 2020, AV4 emailed **McPherson** at info@cararacostarica.com, and stated he is happy to hear construction has restarted.

## Adult Victim 5

25.     Bank records showed that between June 2018 and May 2019, Adult Victim 5 (hereinafter "AV5"), a resident of Dade City, Florida, wired $194,500 to the U.S. Bank account in Oregon, account number ending in 1837.  Emails between AV5 and **McPherson** show that AV5 traveled to Costa Rica to see Carara in June 2018.  The emails also showed two agreements between AV5 with **McPherson**.  On June 4, 2018, McPherson, using email raymond@cararacostarica.com, emailed AV5 a contract.  The contract was for a 10% fractional ownership for $27,500 in a villa located at the Carara Parque Ocean View Resort Community.  On June 5, 2018, AV5 wired $27,500 for the ownership.  The contract listed the Construction

Schedule with the villa to be completed by December 2018 and marketed to rent for December/January.

26.     On August 2, 2018, **McPherson**, using email raymond@cararacostarica.com, emailed AV5.  In the email, **McPherson** stated that the final thing they were waiting on to break ground on AV5 villa was the final approved plans and engineering schematics.  The architect delivered the final plans on August 1st and now they will only have to wait for the permits to break ground.  AV5 expected to have the permits between August 15th and September 15th. **McPherson** also stated the $150,000 JV (Joint Venture) purchase agreement is pretty much finished.

27.     On August 30, 2018, **McPherson**, using email raymond@cararacostarica.com, emailed AV5 a JV agreement.  The contract was not signed.  AV5 was to pay $150,000 for a villa constructed by Carara and to be completed 24 to 36 months from the signature of the agreement.  On September 6, 2018, AV5 wired $150,000 for the JV contract.  AV5 wired an additional $17,000 in different amounts to the Oregon bank account.  An email between AV5 and **McPherson** appeared to indicate some of the additional funds were loans.

**Adult Victim 6**

28.     Adult Victim 6 (hereinafter "AV6"), a resident of Utah, saw an advertisement on Facebook for an investment in Carara Ocean View Resort in Costa Rica.  The investment offered a 1/10th share of a villa with a $30,000 investment.  AV6 responded to the advertisement and requested more information.  AV6 received a phone call from **McPherson** in response to his request.  After talking to **McPherson**, AV6 decided to invest.  **McPherson** told AV6 to just invest $28,000 instead of $30,000.  **McPherson** told AV6 to use the $2,000 difference to fly to

Costa Rica and see the resort for himself.  AV6 never traveled to Costa Rica.  AV6 received the contract by email from **McPherson**.

29.    Emails between AV6 and **McPherson** were reviewed.  In January 2019, **McPherson** sent AV6 the purchase agreement using the email address raymond@cararacostarica.com.  The contract stated the contract to purchase a 10%, 1 share, of a 10 share $300,000 villa.  The villa was described as an ocean view 2 story/2-3 bedroom/3 bathroom, 1250 sq. foot residence.  The section of the contract showing the construction schedule showed the villa was scheduled for groundbreaking in mid-February 2019.  The section further read, that the villa was to be finished and in the rental pool by August/September of 2019 and marketing started to have it fully rented for the high season of September/October 2019.

30.    On or about January 15, 2019, AV6 emailed the signed contract back to **McPherson** and, per the wiring instructions, wired $28,000 for the investment to a U.S. Bank account in Oregon in the name of Carara Park Eco-Resort USA Corporation, account number ending in 1837.

31.    AV6 recorded a phone call between AV6 and **McPherson** that occurred on July 24, 2019.  **McPherson** stated he is currently under two pressures as the developer.  One is from investors that have put up money that want to see construction and the second he has to make land payments to the original landowner.  **McPherson** states if he does not make the land payment the land goes back to the original landowner.  **McPherson** stated that the money that had been put up for construction has been used to make land payments.  **McPherson** had to make sure he didn't default on land because if he did everything is gone and everybody lost. **McPherson** said there is a villa under construction but there is not a finished villa.  The site was

**Page 12 – Affidavit of Miguel A. Perez**                    **USAO Version Rev. April 2018**

not going to look much different than what AV6 had seen before in pictures because **McPherson** had not been able to put the money into construction.

32.     In an email dated December 16, 2019, **McPherson** using email address info@cararacostarica.com, emailed AV6 and stated that the development has been delayed because of overruns and restructuring was also needed but things are now back on track. **McPherson** states the only way he can convince AV6 the funds are safely invested is to see construction progress.

33.     Up until at least March of 2020, AV6 had continued to ask **McPherson** for a full refund of his investment and **McPherson** had continued to give AV6 reasons not to refund his investment.  Facebook conversations showed AV6 asked **McPherson** several times for a refund. **McPherson** eventually told AV6 that after speaking to his attorneys and a large joint venture investor, that $28,000 of the joint venture investment will be used to refund AV6 but only after he visits and sees the finished Carara Mountain Ocean View Villa.  If after visiting AV6 still wants the refund then he will refund him his investment.  No funds have been returned to AV6.

### US. Bank N.A. Records

34.     I reviewed U.S. Bank N.A. records for the Oregon account ending in 1837.  The account was opened on December 16, 2015, and the account holders on the account included "Jimmy R. Williams" and "Carol L. Williams".  The address on the account was in Springfield, Oregon.

35.     As previously detailed, the victims stated that they wired their investment funds to a U.S. Bank account, under the business name of Carara Park Eco-Resort LLC (hereinafter "CPER"), account number ending in 1837.  Since the account opened, the account has received

approximately $1,200,000 USD from over 30 individuals consisting almost exclusively of investor funds.

36.    A review of the bank records revealed that approximately $144,559 had been wired from the account ending in 1837 to an account at a credit union in Vermont.  The account holder in Vermont stated that the funds he received were mortgage payments for a house he and his wife sold in Costa Rica.  The house was sold to the retired couple in Oregon, and **McPherson** lives in the house.  Based on this financial analysis, investor funds are being used to purchase a residence in Costa Rica for the benefit of Jimmy and Carol Williams, and **McPherson**.  The investor's funds were only to be used for the construction of new villas in Costa Rica that were to be owned by the investors, not for the purchase of a residence that they had no ownership interest in.

37.    The U.S. Bank records revealed that several companies and individuals in Costa Rica had been wired funds from the Carara Park Eco-Resort LLC US bank account ending in 1837.  One of the companies that received money in Costa Rica was MEDUSA ABC Limitada (Hereinafter "MEDUSA").  MEDUSA received approximately $621,000 USD at a bank account with Banco BAC San Jose.

**Interview of Jimmy Williams**

38.    On December 11, 2019, Jimmy Williams (hereinafter "Jimmy") was telephonically interviewed.  Jimmy stated that he was in Costa Rica, and he and Carol are retired and spend most of their time there.  Jimmy established the company CPER at the request of **McPherson**.[2]  **McPherson** told Jimmy investors would be more likely to invest in a project in

---

[2] Jimmy referred to McPherson as Raymond James. McPherson's true identity was not

Costa Rica with a bank account opened in the U.S.  The bank account was opened at U.S. Bank to receive deposits from investors and to wire the money to Costa Rica.  Jimmy also said they registered CPER with the Oregon Secretary of State for the sole purpose of opening the bank account.

39.     The Williams bought a house with **McPherson** in Costa Rica.  The Williams' paid $75,000 for the down payment of the house, **McPherson** agreed to make the mortgage payments, and they would all share ownership in the house.  They ended up starting the business, Carara, and buying the house all at the same time.  The mortgage payments are made directly to the aforementioned seller from Vermont.  The Williams' lived with **McPherson** in the house from approximately April 2015 to April 2016.  The Williams' now reside in a different part of Costa Rica.

40.     Jimmy stated he and Carol are not employees of **McPherson** and they have never been employed at any point.  Jimmy stated they are only investors in the Carara development in Costa Rica and they do not make any business decisions.  **McPherson** finds the investors for the project.  Jimmy stated he and Carol were the first investors in the Carara project.  Jimmy does not review the contracts.  Jimmy has probably seen one or two of the contracts and nothing raised red flags.

41.     Jimmy does not know what happens to the money once it goes to Costa Rica. Jimmy believed expenses include the payment for land, an employee, internet service, drone services and infrastructure.  Jimmy stated no investor villas have been built.  The other lots are

discovered until after the interview. It is unknown if Jimmy knows McPherson's true identity.

prepped for construction.  There are gravel roads and leveled building sites with gravel
driveways.  Jimmy believed the bulk of the investor money was to pay for the land.

### McPherson Emails

42.     The contents of some of the emails that **McPherson**, acting as "James", used to
communicate with others have been reviewed.  Emails were found that showed that on or about
March 11, 2015, **McPherson** included the Williams' on emails to potential investors.
**McPherson** responded to investors interested in purchasing a home.  The emails showed that in
March 2015 the project website was www.CararaCostaRica.com.

43.     Electronic copies of invoices for purchases made by MEDUSA were found to
have been received by **McPherson**.  Also found were several emails from
notificaciones@baccredomatic.com to **McPherson** advising that transfers had been realized out
of the MEDUSA bank account to others.  The transfers appear to include payments for services
and expenses.  The emails indicate **McPherson** controls the funds in the MEDUSA bank
accounts.

44.     The emails also indicated **McPherson** controlled the bank account at U.S. Bank
and had authority to request wire transfers.  For example, On November 29, 2015, **McPherson**,
using raymond@cararacostarica.com, emailed the U.S. Bank branch manager.  In the email
**McPherson** gave the bank branch manager wiring instructions for the bank account held at U.S.
Bank.  The Williams are copied on the email, jimcarolwilliams7@gmail.com. **McPherson** asked
the manager to wire $9,800 to MEDUSA.

45.     Also, the emails show that **McPherson** paid the Williams money and he also paid
for their rent after they moved out of the house they owned together.  On February 21, 2017,

**McPherson** using email info@cararacostarica.com, emailed the Williams' landlord.  The email

is in response to an email that Jimmy received from the landlord.  In the email, the landlord

stated he has not heard from Jim regarding the arrears in rent.  Jimmy forwarded the email to

**McPherson**.  In the email from **McPherson** to the landlord, **McPherson** stated he intended to

catch up on the late rent and to pay the rent somewhere between 30 to 60 days in advance.

46.     On January 22, 2018, **McPherson**, using email raymond@cararacostarica.com

emailed the Williams at jimandcarolwilliams@costarica2020.com and

jimcarolwilliams7@gmail.com.  In the email **McPherson** states he has 6 deals close and he

understands the pressure they must have because of the lack of payment from **McPherson**.

**McPherson** states it is worse on his end.  **McPherson** continues that in retrospect, he doesn't

think the combo of regular Carara expenses, the Carara payment on the house, and the payments

on the land, and the payments to the Williams' was a good idea.  **McPherson** states the same

problem as always, he can't get the rate of monthly sales high enough to pay all that.

47.     The emails also showed that **McPherson**, even up until March 2019, had not

started construction and was using investor funds to pay for the mortgage of the house he lived

in.  On March 20, 2019, McPherson using email raymond@cararacostarica.com, emailed the

U.S. bank branch manager.  In the email McPherson stated a $110,000 wire posted and "finally

we will be into construction".  **McPherson** gave wiring instructions for the mortgage in the

amount of $20,179.24, and a transfer of $22,500 to MEDUSA.

48.     The emails showed the **McPherson** was having trouble getting enough investors

to keep up with costs.  On May 9, 2019, **McPherson** emailed Jimmy, stating in part, "…and

now, cash needs monthly to keep the staff working now that I HAVE good staff, and then with

ongoing construction of villa and other development costs, now we are an animal that eats $50,000 a month, but that is fine, as long as I am bringing in $60,000 a month or more."

### Facebook

49.     On March 19, 2015, McPherson posted from the Facebook profile "Raymond James" that he was announcing their new "Costa Rica Ocean View Eco Community and Wellness Center on Carara Mountain." McPherson also provided a link to the Facebook page.

50.     In April 2020, a Facebook account used by McPherson was reviewed and it was discovered **McPherson** was still actively trying to find new investors. An advertisement was found for Carara Costa Rica for buyers to invest in a three-bedroom ocean view resort villa. The advertisement claimed $27,500 would give investors a 10% ownership in a villa worth $450,000+. It also claimed immediate 50% profits in 6 months.

51.     In summary, this investigation has established that a majority of the investor funds have been spent, that no villas have been built and the victims have not received a return on their investment or their money back. Since 2015, **McPherson** has continued to provide excuses to investors why no villas have been built while continuing to solicit new investors with the assurance that their villa is expected to be built within approximately six months and generate revenue for the investor. **McPherson** has also continued to falsely represent his identity to be a businessman named Raymond James rather than his true identity, **Robin James McPherson**, a fugitive wanted in the United States.

### <u>Conclusion</u>

52.     Based on the foregoing, I have probable cause to believe, and I do believe, that **McPherson** committed violations of Title 18, United States Code, Section 1343, Wire Fraud,

and Title 18, United States Code, Sections 1956 and 1957, Money Laundering.  I therefore

request that the Court issue a criminal complaint and arrest warrant for **Robin James**

**McPherson**.

53.    Prior to being submitted to the Court, this affidavit, the accompanying complaint

and the arrest warrant were all reviewed by Assistant United States Attorney (AUSA) Gavin

Bruce, and AUSA Bruce advised me that in his opinion the affidavit and complaint are legally

and factually sufficient to establish probable cause to support the issuance of the requested

criminal complaint and arrest warrant.

### Request for Sealing

54.    It is respectfully requested that the Court issue an order sealing, until further order

of the Court, all papers submitted in support of the requested criminal complaint and arrest

warrant.  I believe that sealing these documents is necessary because the information to be seized

is relevant to an ongoing investigation, and any disclosure of the information at this time may

cause flight from prosecution, cause destruction of or tampering with evidence, cause

intimidation of potential witnesses, or otherwise seriously jeopardize an investigation.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

**Page 19 – Affidavit of Miguel A. Perez**                    **USAO Version Rev. April 2018**

Premature disclosure of the affidavit, the criminal complaint, and the arrest warrant may

adversely affect the integrity of the investigation.

/s/ Miguel A. Perez, Per Rule 4.1

Miguel A. Perez
Special Agent, FBI


Sworn in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone at 2:45pm
a.m/p.m. on October 22, 2020 .

MUSTAFA T. KASUBHAI
United States Magistrate Judge

**Page 20 – Affidavit of Miguel A. Perez**          **USAO Version Rev. April 2018**